2006 WY 61

**In the Matter of the Worker's Compensation Claim of Eleanor L. PERRY, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

No. 05–54.

Supreme Court of Wyoming.

May 16, 2006.

Representing Appellant: Bernard Q. Phelan, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; and Kristi M. Radosevich, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1] Eleanor L. Perry appeals from the district court's order affirming the Office of Administrative Hearings' (OAH) denial of her claim for worker's compensation benefits. The OAH hearing examiner denied her claim in accordance with the test enunciated in *Smith v. Husky Terminal Restaurant, Inc.,* 762 P.2d 1193 (Wyo.1988), because she was injured while violating a safety regulation. We conclude OAH properly applied the *Smith* test to Ms. Perry's claim and there was substantial evidence to support OAH's factual findings. Consequently, we affirm.

### ISSUES

[¶ 2] Ms. Perry articulates a single issue on appeal:

When an employee deviates from a prescribed safety rule resulting in injury, should worker['s] compensation benefits be denied?

The Division phrases the issue a little differently:

In limited situations, an employee can be found to have acted outside the scope of employment by violating a work restriction when the four elements in *Smith v. Husky Terminal Restaurant, Inc.,* 762 P.2d 1193 (Wyo.1988) are present. The issue presented in this appeal is whether the hearing examiner's application of *Smith* to Perry's case was in accordance with law[.]

### FACTS

[¶ 3] On October 7, 2003, Ms. Perry began work as a certified nurse assistant (CNA) for Mountain Towers Healthcare and Rehabilitation Center (Mountain Towers) in Cheyenne. Mountain Towers is a nursing home facility. When she began work, Ms. Perry had just finished her training as a CNA, which included education about proper lifting techniques. On her first day of work, Ms. Perry attended Mountain Towers' employment orientation. The orientation included instructions for lifting patients who required help. Ms. Perry was informed that certain patients were classified as "two-person lifts," meaning that two people were required in order to lift the patient. Mountain Towers had a written policy forbidding its employees from lifting a patient classified as a "two-person lift" alone, and Ms. Perry signed a document acknowledging the policy. The policy was intended to protect Mountain Towers' employees and patients. The policy stated that, if another employee was not available to help with a two-person lift, the employee was to make the patient comfortable and wait for assistance. Ms. Perry was informed that violating the two-person lift policy could result in termination from employment with Mountain Towers.

[¶ 4] On October 26 through 27, 2003, Ms. Perry was working a night shift, from 10:00 p.m. through 6:00 a.m. During that shift, there were typically only three people on staff per floor—two CNAs and one licensed practical nurse (LPN). At approximately 2:30 a.m., Ms. Perry was making the rounds to check on patients, when one patient requested assistance in using the bathroom. The patient was classified as a "two-person lift" so Ms. Perry sought help. The other CNA was assisting another patient and could not immediately help Ms. Perry. The LPN refused to help her because lifting was not part of her job duties. Ms. Perry offered the patient a bed pan, but the patient refused and insisted upon getting up to use the bathroom.

[¶ 5] Ms. Perry assisted the patient to the bathroom and, at some point in the process as she was lifting the patient, the wheelchair moved. In order to prevent the patient from falling, Ms. Perry twisted and strained her lower back. She felt the strain but did not experience pain until after she had finished her shift and returned home. She was

scheduled to work the next night, but called in and said she was unable to work because she had injured her back.

[¶ 6] Ms. Perry filed a report of injury in which she stated she injured her lower back when she was "transferring a 2 person transfer by [herself] and twisted and strained [her] back the wrong way while trying not to drop [the] resident as her wheelchair started to move even with [the] locks on." She sought medical treatment from various doctors for her back injury and requested worker's compensation benefits as a result of the injury. Mountain Towers objected to Ms. Perry's request for worker's compensation benefits, and the Division issued a final determination denying Ms. Perry's request for benefits on several bases.

[¶ 7] The case was referred to OAH, and a hearing examiner held a contested case hearing on May 6, 2004. The Division argued there were several reasons to deny Ms. Perry's request for worker's compensation benefits, including: Ms. Perry failed to timely report her injury to her employer and to the Division, her back injury was preexisting, her back injury did not occur while she was at work, and she was injured while violating a safety regulation. The hearing examiner found Ms. Perry had reported her injury in a timely fashion, she was injured while at work, and she did not suffer from a preexisting condition which would prevent her from obtaining worker's compensation benefits. However, the hearing examiner found Ms. Perry had violated Mountain Towers' safety rule prohibiting unassisted two person lifts and concluded, under the holding in *Smith,* she was not entitled to worker's compensation benefits. Ms. Perry petitioned the district court for review of the OAH decision, and the district court affirmed. She, subsequently, filed a notice of appeal from the district court's order.

## STANDARD OF REVIEW

[¶ 8] "'When considering an appeal from a district court's review of agency action, we accord no special deference to the district court's conclusions. Instead, we review the case as if it had come directly to us from the administrative agency.'" *Newman*

*v. State ex. rel Wyo. Workers' Safety and Comp. Div.,* 2002 WY 91, ¶ 7, 49 P.3d 163, 166 (Wyo.2002) quoting *French v. Amax Coal West,* 960 P.2d 1023, 1027 (Wyo.1998).

[¶ 9] Ms. Perry and the Division each presented evidence to OAH. Upon appeal from a contested case hearing where both parties have presented evidence, we apply the substantial evidence standard to review the agency's findings of fact. *See KG Constr., Inc. v. Sherman,* 2005 WY 116, ¶ 9, 120 P.3d 145, 147–48 (Wyo.2005); *Robbins v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2003 WY 29, ¶ 18, 64 P.3d 729, 732 (Wyo.2003). Substantial evidence is more than a scintilla of evidence. It consists of relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.* However, even if the factual findings are found to be supported by substantial evidence, the ultimate agency decision may still be found to be arbitrary or capricious for other reasons. Thus, the appellate court does not examine the record only to determine if there is substantial evidence to support the agency's decision, but it also must examine all of the evidence in the record to determine whether the hearing examiner could have reasonably made its finding and order. *Newman,* ¶ 24, 49 P.3d at 172.

[¶ 10] An administrative agency's conclusions of law are not entitled to the same deference as its factual findings. *Diamond B Serv's, Inc. v. Rohde,* 2005 WY 130, ¶ 12, 120 P.3d 1031, 1038 (Wyo.2005). We review an agency's conclusions of law *de novo,* and "we will affirm an agency's legal conclusion only if it is in accordance with the law." *Id.* quoting *DC Production Service v. Wyo. Dep't of Employment,* 2002 WY 142, ¶ 7, 54 P.3d 768, 771 (Wyo.2002).

## DISCUSSION

[¶ 11] Ms. Perry claims the hearing examiner erred by ruling that she should be denied benefits for violating the two-person lift rule. The hearing examiner relied upon our decision in *Smith* in concluding Ms. Perry was not entitled to worker's compensation benefits. Smith was a cook at a truck stop

restaurant and had previously suffered back pain, although it was not clear her prior back pain was job related. *Smith*, 762 P.2d at 1194–95. She sought medical treatment for her back condition, and her physician ordered her not to lift anything weighing more than fifteen pounds. *Id.* at 1195. Smith's employer received a letter from her doctor containing the lifting restriction and discussed the restriction with her. The doctor's letter was posted above the manager's desk, and Smith was instructed "to have someone else lift any heavy items for her if that became necessary." *Id.* One night, Smith attempted to drain a bucket of marinated chickens and injured her back. *Id.* at 1195. She sought worker's compensation benefits for her injury, but her employer objected because her injury resulted from her violation of the lifting restriction. *Id.* at 1196. The district court denied benefits,[1] and Smith appealed.

[¶ 12] In reviewing the case, we looked to the definition of an "injury" which qualifies for compensation under the worker's compensation system. The statutory definition of a compensable injury requires that an injury "arise out and in the course of employment." Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2005). The determination of whether an injury arose out of and in the course of employment is a question of fact. *Farman v. State ex rel. Wyo. Workers' Comp. Div.*, 841 P.2d 99, 102 (Wyo.1992). In considering the employer's defense that Smith violated a known safety rule, we stated: "[p]recedent concerning the type of misconduct that is a deviation from the scope of a particular employment focuses on whether the employee knowingly does certain work specifically prohibited, as opposed to an employee's doing authorized work in an unauthorized way." *Smith*, 762 P.2d at 1196. We stated:

> Professor Larson articulates this distinction as the difference between a work restriction on the *ultimate* work to be done and a work restriction concerning the

*method* by which the ultimate work is to be done. 1A A. Larson, Workmen's Compensation Law, § 31.00 at 6–8 to 6–14 (1985). A specific restriction on the ultimate work to be done can restrict a task of the same character as other tasks which are not prohibited, and still place the prohibited task outside the scope of an employment.

*Id.* (some citations omitted). In order to help with making that distinction, we adopted the following test in *Smith:*

> [A]n employee can be found to have acted outside the scope of employment by violating a work restriction when the following elements are shown: (1) the employer expressly and carefully informs the employee that she must not perform a *specific task or tasks* while in his employ; (2) the employee knows and understands the specific restriction imposed; (3) the employer has not knowingly continued to accept the benefit of a violation of the restriction by the employee; and, (4) the injury for which benefits are claimed arises out of conduct that clearly violates the specific restriction.

*Id.* at 1196–97. We recognized the test is restrictive and "there are limited situations in which an employer can put on evidence to refute an employee's preponderance showing that the work causing her injury occurred within the scope of her employment because a work restriction was violated." *Id.* at 1196.

[¶ 13] In the case at bar, the hearing examiner found Ms. Perry had violated the rule prohibiting her from performing a two-person lift unassisted and, under *Smith,* she was not entitled to benefits. The factual record clearly supports the hearing examiner's conclusion. The first and second elements of the *Smith* test require the employer expressly and carefully inform the employee she must not perform a specific task while in its employ and the employee know and understand the restriction. At the contested case hearing, Lacrecia Patterson, Mountain Towers' executive director, testified all employees receive instruction on safety policies when they are hired. Mountain Towers had

---

1. At the time *Smith* was decided the district court sat as the fact finder. The worker's compensation system was subsequently revised by the legislature, and OAH was designated to conduct

the contested case proceedings under the Worker's Compensation Act. *See* Wyo. Stat. Ann. §§ 27–14–101 *et. seq.* (LexisNexis 2005).

a written policy stating the two-person lift restriction, and Ms. Perry signed a document acknowledging the policy. Ms. Perry testified that, at her employment orientation, Mountain Towers instructed she was not to perform a two-person lift without assistance. She acknowledged performing a two-person lift alone was a serious violation of Mountain Towers' safety policies, which could result in disciplinary action, including termination. Obviously, there was ample evidence to support a finding that the first two elements were satisfied.

[¶ 14] The third element of the *Smith* test is the employer did not knowingly accept the benefit of a violation of the restriction by the employee. This element was contested at the hearing. Ms. Perry testified she was instructed to honor the patients' rights to privacy and she believed, at the time she was injured, she was complying with the requirement by helping the patient use the restroom. She also testified the "graveyard shift" was habitually understaffed, causing her to have to choose between honoring the patient's rights and complying with the two-person lift restriction. In fact, she testified she had violated the two-person lift rule several times in her short tenure with Mountain Towers. Thus, she claimed Mountain Towers accepted the benefit of her violation of the two-person lift restriction.

[¶ 15] The record contains no evidence to support Ms. Perry's claim the graveyard shift was understaffed in accordance with industry or legal standards. Furthermore, Ms. Perry did not testify she had notified Mountain Towers prior to her injury about the perceived staffing problem. Although evidence showing other employees routinely violated the two-person lift policy may have supported Ms. Perry's claim of understaffing, no such evidence exists in the record. To the contrary, Ms. Patterson denied knowledge of prior incidences of employees violating the two-person lift rule, and she testified violating the policy was a serious breach of Mountain Towers' employment regulations which could result in termination of employment. Ms. Patterson also testified Mountain Towers did not benefit from violation of the rule

because it placed both the employee and the patient at risk.

[¶ 16] With regard to this particular incident, Ms. Perry did not testify as to how long she and the patient would have had to wait for assistance from the other CNA. Instead, she simply asserted she was required to violate the safety regulation in order to make the patient comfortable and to comply with her obligation to respect the patient's right to privacy. In doing so, she injured herself and nearly dropped the patient, which were exactly the dangers the policy was designed to prevent. Substantial evidence supports the hearing examiner's conclusion that Mountain Towers did not knowingly accept the benefit of Ms. Perry's violation of the two-person lift restriction.

[¶ 17] The record also supports the hearing examiner's finding the final element of the *Smith* test was satisfied. Ms. Perry admitted her back injury occurred because she performed a two-person lift by herself. She strained her back when she twisted to prevent the patient from falling. In fact, Ms. Perry's own statement in her employee incident report acknowledged her violation of the policy caused her injury. One question on the report asked: "What were you doing at the time of the incident, and what could you have done to prevent this incident?" Her handwritten answer stated: "I could [have] had 2 people to help with the transfer if the other CNA would have helped...."

[¶ 18] Ms. Perry seems to acknowledge the record supports the hearing examiner's factual findings, and she does not seriously contest those findings. Instead, she approaches the issue from another angle by arguing her injury arose out of and in the course of her employment because her violation of the lifting rule was not a departure from the ultimate work to be performed but was merely an unauthorized method of performing the ultimate work. Relying on Professor Larson's treatise, she claims her injury is compensable because she violated a proscribed means or method of performing the ultimate work but she did not stray from the ultimate work she was hired to perform. Specifically, Ms. Perry claims her act in performing a two-person lift without assistance

was part of her ultimate work, which included lifting patients and helping them to the restroom. She argues the unassisted two-person lift was simply a prohibited method of performing her ultimate work, and she is, therefore, entitled to worker's compensation benefits.

[¶ 19] As we recognized in *Smith,* the distinction between whether a restriction is upon the ultimate work to be done versus a restriction on the method to accomplish the ultimate work is not always easy to make. The difficulty is in determining the ultimate work to be accomplished by the worker. Professor Larson described the problems as follows:

§ 33.02 **Misconduct Which Is Not a Deviation from Employment**

[1] **Distinction Between Prohibited Thing and Method**

We have here to do with a simple distinction: that between "thing" and "method." Rules and prohibitions may define the ultimate "thing" which claimant is employed to do, or they may describe the methods which he may or may not employ in accomplishing that ultimate "thing." The only tricky feature of this distinction is that it can, by a play upon words, be converted into a contradiction of itself. For example, it seems clear enough that if the claimant's main job is to lift flour sacks, the raising of the flour sacks is the "thing" for which he is employed. If, in violation of instruction, he rigs up a rope hoist to do the job, it should be clear enough that his departure is merely from the method prescribed.

Yet the argument will sometimes be seen that the violation is one of a rule limiting the "thing," because the "thing" for which the claimant is employed is "to lift flour sacks by hand and not by hoist." Of course, by so blending ultimate object and method, one can convert all instructions on method into delimitations on the scope of employment, and end by reducing the distinction to absurdity.

2 Larson's Worker's Compensation Law, § 33.02[1] (2005).

[¶ 20] Recognizing the inherent difficulty with distinguishing between the ultimate work and a method of performing the ultimate work, we adopted the test articulated in *Smith* to provide a methodology for making that distinction. The *Smith* test is restrictive and only limits the scope of employment, and thereby the compensability of the injury, when the rule against performing a certain task has been clearly communicated to the employee and the employer has not knowingly accepted the benefit from the employee's violation of the rule. This is consistent with cases from other jurisdictions which recognize a specifically delineated safety rule may limit the scope of employment so long as it is clearly explained to the employee. Compare, *Ramsdell v. Horn,* 781 P.2d 150 (Colo.Ct.App.1989) (allowing worker's compensation benefits to epileptic employee who violated employer's general directive not to work "up high") with *Bill Lawley Ford v. Miller,* 672 P.2d 1031 (Colo.Ct.App.1983) (denying benefits to family of intoxicated worker who was killed while working after he had been expressly directed to cease working). *See also, Saunders v. Industrial Comm'n,* 301 Ill.App.3d 643, 235 Ill.Dec. 490, 705 N.E.2d 103 (1998) (denial of benefits to worker injured while riding double on a forklift in violation of employer's clear directive); *Scheller v. Industrial Comm'n,* 134 Ariz. 418, 656 P.2d 1279 (Ct.App.1982) (denying benefits to security worker who pursued criminals off the employer's premises in violation of employer's prohibition against leaving the premises). *See also,* L. Sharp, *Violation of Employment Rule as Barring Claim For Workers' Compensation,* 61 A.L.R.5th 375 (1998) (collecting cases).

[¶ 21] When compared with the facts of *Smith,* Ms. Perry's actions were similarly outside the scope of her employment and constituted a prohibited "thing" not a "method". Ms. Perry was specifically directed not to perform a two-person lift alone. She was clearly aware of the rule and the fact the patient was classified as a two-person lift. Ms. Perry knew she was violating the rule, doing a prohibited thing and risking termination from her position when she did it. The dissent in *Smith* argued the evidence was unclear as to whether the bucket of chicken Ms. Smith lifted exceeded the fif-

teen-pound weight limitation. *Smith*, 762 P.2d at 1198–99 (Urbigkit, J. dissenting). No similar uncertainty existed in this case.

[¶ 22] Although her argument is not well developed, Ms. Perry seems to also argue the test articulated in *Smith* is inconsistent with the concept that the worker's compensation system is not intended to be a fault-based system. As we have explained in prior opinions, the worker's compensation system in Wyoming is authorized by Art. 10, § 4 of the Wyoming Constitution and provides tort immunity to employers in exchange for employees receiving a type of industrial-accident insurance. *Spera v. State, ex rel., Wyo. Workers' Comp. Div.*, 713 P.2d 1155, 1156 (Wyo.1986). Thus, the worker's compensation system is not a tort-based system but is, instead, based upon contract. *Id.*

> "The amendment to Art. 10, § 4 of the Wyoming Constitution and subsequent enabling legislation did not contemplate that tort law would hold any office in the Worker's Compensation Act except that the employer could defend against claims of the injured employee on the grounds that he or she was culpably negligent. Soon after the amendment to Art. 10, § 4 of the Wyoming Constitution, this court said that the Wyoming worker's compensation scheme was in the nature of an industrial-accident policy."

*Id.*, quoting *Cottonwood Steel Corp. v. Hansen*, 655 P.2d 1226, 1236 (1982).

> "Instead of suing his employer for negligence and having to prove duty, breach, proximate cause, and damages, the worker in our state must file for worker's compensation benefits for which his employer is ultimately liable. *Baker v. Wendy's of Montana, Inc.*, Wyo., 687 P.2d 885, 888 (1984). Essentially, the system provides disability insurance coverage for the worker. His right to benefits arises when certain conditions precedent occur, primarily,

when he suffers a **disabling work-related injury.**"

*Spera*, 713 P.2d at 1157 (emphasis added). Thus, the concept of fault does not enter the calculation so long as the employee is engaged in work-related activities when injured.[2] The principles of *Smith* look at the threshold question—whether the injury occurred while the employee was engaged in a task which is part of the employee's work. Until that requirement is satisfied, the employee does not qualify for his contractual right to worker's compensation benefits. Thus, the *Smith* ruling simply delineates a method for determining the parameters of the work which is covered by worker's compensation; it does not inappropriately incorporate fault principles into the worker's compensation analysis.

[¶ 23] Affirmed.

KITE, J., delivers the opinion of the Court; HILL, C.J., files a dissent, in which BURKE, J., joins.

HILL, Chief Justice, dissenting, with whom BURKE, Justice, joins.

[¶ 24] I respectfully dissent because I am not convinced that we should continue to recognize or apply the now dated and largely discredited rule that we adopted in *Smith v. Husky Terminal Restaurant, Inc.*, 762 P.2d 1193, 1196–97 (Wyo.1988). Moreover, even if this Court is to continue to recognize that rule, it is my view that it does not apply to the circumstances of this case. In *Smith*, we set out the rule in these terms:

> Considering this precedent, it is apparent that there are limited situations in which an employer can put on evidence to refute an employee's preponderance showing that the work causing her injury occurred within the scope of her employment because a work restriction was violated. We hold that an employee can be found to have acted outside the scope of employment by violating a work restriction when the following elements are shown: (1) the

2. The Division apparently argues on appeal that Ms. Perry's claim also could be denied pursuant to § 27–14–102(a)(xi)(C), because her injury resulted solely from her culpable negligence. The statutory defense of culpable negligence was not addressed during the administrative hearing. Consequently, we will not consider that argument for the first time on appeal. *See Holloway v. Wyo. Game and Fish Comm'n*, 2005 WY 144, ¶ 12, 122 P.3d 959, 962 (Wyo.2005).

employer expressly and carefully informs the employee that she must not perform a *specific task* or *tasks* while in his employ; (2) the employee knows and understands the specific restriction imposed; (3) the employer has not knowingly continued to accept the benefit of a violation of the restriction by the employee; and, (4) the injury for which benefits are claimed arises out of conduct that clearly violates the specific restriction.

*Smith,* 762 P.2d at 1196 (emphasis in original).

[¶ 25] We cited these facts, proved up by Smith's employer, as falling within the reach of the rule:

In this case the presence of these four elements is supported by sufficient evidence. Before [Smith] began working as a cook, which she was doing when she reinjured her back, her employer gave her specific and express instructions not to lift anything heavier than fifteen pounds. Her employer did not rehire her as a cook until it received written confirmation from her doctor of what her physical capabilities would be. Her employer discussed this with her and posted her doctor's letter above the manager's desk. Employee's own testimony was that she understood the restriction on lifting the bucket of chickens; further, she had asked other restaurant employees to drain the bucket of chickens for her on occasion before she injured herself at work. Employee considered this restriction on the night of her injury, as illustrated when she tried to awaken Mr. Stockmeyer to lift the bucket for her before she tried to lift it herself. Employee failed to present any evidence, other than her own opinion, to substantiate her fear that by failing to drain the chickens she might be fired. Employer was not shown to have accepted the benefit of any previous violation of the specific lifting restriction before employee injured herself lifting the bucket. The district court heard all of the testimony and determined that employee, despite her complete understanding of the lifting restriction, disregarded the restriction and caused the type of injury the restriction was intended to prevent. We must accept these findings of fact by the district court; they support the conclusion that employee's injury did not occur within the scope of her employment.

*Smith,* 762 P.2d at 1197.

[¶ 26] To begin with, I conclude that this case got a bit off track from the very outset because of the loose use of technical trade terminology that needed to be treated more precisely. Central to the occupation of nursing is the matter of "patient handling" or "patient transfers." See, e.g., *http://www.uvsc.edu/nurs/reportPhysicalDemands.hyml* (Patient Transfers); *http://www.hlt h.gov.bc.ca/assisted/pdf/guidelines/pdf* (Definitions and Selections of Safe Client Transfer/Lift); Delmar's Fundamental & Advanced Nursing Skills (2nd ed.2004), Skill 4–17, *Assisting from Bed to Wheelchair, Commode, or Chair;* Sandra F. Smith, Donna J. Duell, and Barbara C. Martin, Clinical Nursing Skills, Basic to Advanced Skills (2004); and Audrey Nelson, Ph.D., RN, FAAN (Director, Patient Safety Center of Inquiry, Ergonomics Research Laboratory, VAMC Tampa FL), *Safe Patient Handling and Movement.* Of course, we may not and do not rely on these extra-record materials as evidence in this case. See *Tarraferro v. Wyoming Medical Commission,* 2005 WY 155, ¶ 14, 123 P.3d 912, 918 (Wyo.2005) Nonetheless, we include them here to illustrate the kind of evidence that is missing in this case and, furthermore, to demonstrate that the Division's theory of the case, i.e., that "the employer expressly and carefully inform[ed] the employee that she must not perform a specific task or tasks while in his employ" is not supported by substantial evidence in the record, as well as the invalidity of the Division's argument that the incident at issue was outside the course and scope of Perry's employment.

[¶ 27] Moreover, I am unable to conclude that Perry knew and understood the specific restriction imposed, simply because the record does not include any specifics about the employer's rule. Furthermore, Perry claimed that her employer had knowingly continued to accept the benefit of violations of that restriction by her, and the only evidence that rebuts that was the employer's

disclaimer that it was "not aware of" any such behavior. Finally, my conclusion is that the injury for which benefits are claimed arose out of conduct that was in the employer's best interests, that the rule is primarily for the protection of patients (and only of secondary benefit for employees) and could not have violated the specific restriction, because the restriction was at best general and in no way confined Perry's work efforts by carefully defined or specialized instruction.

[¶ 28] As we noted in *Smith,* 762 P.2d at 1196: "[T]here are limited situations in which an employer can put on evidence to refute an employee's preponderance showing that the work causing her injury occurred within the scope of her employment because a work restriction was violated." In her opening statement, Perry's attorney more or less conceded that Perry had performed a "two-person lift." Of course, one person cannot do a "two-person lift" because by definition it requires two persons. As the materials we cited above ably demonstrate, there are a number of alternatives to a "two-person lift," many of which require only one person. In this instance, the great weight of the evidence suggested that Perry decided that the circumstances that presented themselves to her required her to do a patient transfer, or patient assist, that required only one person, because she was the only person available to do the task at the time the task needed to be done. Perry testified that she had done such transfers or assists on several other occasions. What Perry described in her testimony is what is generally called a pivot assist from bed to wheelchair (which may also be done from wheelchair to commode, from commode to wheelchair, and from wheelchair back to bed). The difficulty, or emergency, arose only when the wheelchair moved and the patient began to fall, apparently because the wheelchair brakes had not been set or were inoperative.

[¶ 29] It was the employer's position that Perry had received "extensive training" and clearly understood "lifting." Perry denied that she had been afforded "extensive training:" " . . . [T]he only orientation we had on lifting was looking at a book showing us proper ways of lifting. No techniques. We were told to sign it to state we were showed the proper ways of lifting." Perry made it very clear in her testimony that it was her professional assessment at the time this event occurred that she needed to assist the patient at issue so that the patient could use the bathroom. The materials that were used in this "training" process, if indeed there were any, are not a part of this record on appeal. The record on appeal also provides no information about the patient that Perry was assisting, so it is at best speculation that the patient required a "two-person lift" in order to be transferred from her bed to a wheelchair.

[¶ 30] For the most part, the Division relied on Perry's testimony that she knowingly violated the "two-person lift" rule in order to refute her prima facie case that she was injured in the course and scope of her employment. It is my view that Perry's testimony does not support the Division's position and, as noted above, the training materials and the exact status of the patient in question were not made a part of the record by the Division. The Executive Director of Mountain Towers Healthcare and Rehabilitation Center testified for the Division. There is no indication in the record that she possessed any special skills or expertise with respect to patient handling or patient transfers. It came as no surprise to the Executive Director that there were only three employees available to provide care, during the nighttime hours, to the approximately 50 residents on the floor where Perry worked (This accident occurred at about 2:30 a.m.). When asked if she was present at the orientation that Perry attended, the Executive Director admitted that she was not. When asked if the orientation normally included lifting techniques, the best answer she could give was, "As far as I know, yes." The Executive Director also testified that during the day, most of the residents on the floor where Perry worked "are up ambulating," (Thus, there is increased staffing during the day, whereas at night the patients are in bed, so staffing is considerably reduced.). From the record extant, it is a fair conclusion that the patient at issue in this matter was at least partially ambulatory, whether the time of day was daytime or nighttime.

[¶ 31]  It is of some significance that after Perry filed her claim for worker's compensation benefits, Mountain Towers notified the Division that it was "formally objecting to this workman's [sic] compensation claim . . . due to the fact the employee failed to report the incident, there are no witnesses to the incident, she failed to report to the facility to fill out an employee incident report until November 5, 2003." Thus, the matter of the employer rule was not broached in Mountain Towers' "formal" objection. We also note that it is painfully clear that there was at least one witness to the incident (the patient), other than Perry, but neither Mountain Towers nor the Division attempted to present evidence from that witness or about that witness/patient.

[¶ 32]  In its final determination, the Division noted that there are "inconsistencies between what [Perry] reported and information from [Perry's] employer." The inconsistencies are not identified. The Division also stated that the employer had no record of the occurrence, and that the incident did not meet the definition of an injury. The Division also noted that it had not received all medical notes/documentation, although what it deemed to be missing was not identified. The final determination went on to note that Perry had not timely reported to her employer or the Division. The Division intimated that Perry suffered from a preexisting injury. Thus, the Division denied the claim on those bases.

[¶ 33]  Perry challenged the final determination and her case was set for hearing. In its pretrial disclosure statement, the Division raised ten issues: (1) That Perry had the burden of proof as to each essential element necessary to sustain her claim for benefits; (2) that Perry didn't timely report the injury to the employer; (3) that Perry did not timely report the injury to the Division; (4) that failure to report indicates that no injury occurred; (5) that Perry only worked for the employer for 20 days and was absent three times during that time period; (6) and (7) that Perry engaged in doctor shopping; (8) the Division found it inexplicable that Perry could get to work on 17 days, but could not get to her employer to report her injury (this

was cleared up because Perry could not ambulate during some of this time on account of her injury, and because there was also a blizzard at the time that prevented Perry from getting to town to file a report); (9) that Perry had a preexisting condition; and (10) that Perry violated an employer's rule by single-handedly performing a two person lift.

[¶ 34]  The hearing officer concluded that Perry proved by a preponderance of the evidence that she was injured in the course of her employment and that her testimony was credible in all respects, as well as that all of her reports were timely, that she did not have a preexisting injury, and that she had not "doctor shopped." However, the hearing officer also concluded that Perry's violation of the employer's "two-person lift" rule "takes her outside the course and scope of her employment." Thus, her claim for worker's compensation benefits was denied. Perry appealed to the district court under W.R.A.P. 12, and the district court affirmed the determination made by the hearing officer.

[¶ 35]  The next step in this analysis is to explore the underpinning of our decision in *Smith* and to ascertain what the vitality of that decision is today, and, in particular, what application it has to the circumstances presented here. In *Smith,* our decision relied in significant part on a citation to Professor Larson's treatise. *Smith,* 762 P.2d at 1196. This is what Professor Larson's treatise has to say on that subject now:

### § 33.02  Misconduct Which Is Not a Deviation from Employment

#### [1]  Distinction Between Prohibited Thing and Method

We have here to do with a simple distinction: that between "thing" and "method." Rules and prohibitions may define the ultimate "thing" which the claimant is employed to do, or they may describe the methods which he may or may not employ in accomplishing that ultimate "thing." The only tricky feature of this distinction is that it can, by a play upon words, be converted into a contradiction of itself. For example, it seems clear enough that if the claimant's main job it to lift flour

sacks, the raising of the flour sacks is the "thing" for which he is employed. If, in violation of instruction, he rigs up a rope hoist to do the job, it should be clear enough that his departure is merely from the method prescribed.

Yet the argument will sometimes be seen that the violation is one of a rule limiting the "thing," because the "thing" for which the claimant is employed is "to lift flour sacks by hand and not by hoist." Of course, by so blending ultimate object and method, one can convert all instructions on method into delimitations of scope of employment, and end by reducing the distinction to absurdity. One can say that a lineman is employed only to repair lines while he has his gloves on, that an errand boy is employed to deliver a message by way of Street A and not by way of street B, and that an oiler is employed to oil only machines that are standing still and not those that are in motion. Actually, as the review of cases below will show, this sophistry has had very little success, and the great weight of present authority respects the plain meaning of the distinction between method and ultimate objective.

## [2] Prohibited Methods, Tools, or Materials

A brief catalog of the kinds of forbidden misconduct which, since they related only to method, have not blocked compensation, will serve to show better than anything else the extent to which modern compensation law has eliminated the employee-fault concept from the test of compensability. Each of the following items of conduct was not only rash in itself, but was specifically forbidden by the employer: sitting upon a fender to operate a dangerous machine instead of standing as ordered; climbing onto a basketball goal to paint the roof of a gymnasium; attempting to move a large metal charging board with a forklift; operating a meat-grinding machine with the guard removed; oiling machinery in motion; using alcohol to light a fire; carrying a gun; reaching into a machine without stopping it; speeding up iron-moulding to do five-hours' work in four; jumping a railing instead of following a stairway; climbing a fence rather than walking 300 feet to the gate; getting on or off a moving vehicle; riding on top of the cab of a truck or on the running board; leaving a trolley in such condition that it might move when a connection was made; washing a car with inflammable liquid without disconnecting the battery; failing to use a respirator and getting lead poisoning from fumes; using an emery wheel for a job for which the employer had said it was unsuitable; using sulphuric acid to clean a urinal instead of Gold Dust; climbing a tree without tying oneself in with a rope; and pouring gasoline into the tank of a motor while the motor was running. At least one court has even included becoming intoxicated in the category of forbidden misconduct that will not preclude compensation.

There are almost no *contra* holdings. The case of *Plumb v. Cobden Flour Mills Company Limited*, denying compensation to a foreman who used a rope and revolving shaft to lift flour sacks when the pile became too high, is so distinctly out of line with other British decisions on forbidden method that it probably is of no present importance. And the Massachusetts cases denying compensation to the claimants who jumped on or off moving vehicles were based on a different principle, the now obsolescent "added risk" doctrine.

2 Larson's Workers' Compensation Law, § 33.02[1] and [2] at 33–10—33–12 (2005).

[¶ 36] Along these same lines, in the case, *Fondulac Nursing Home v. Industrial Commission*, 99 Ill.2d 519, 77 Ill.Dec. 447, 460 N.E.2d 751 (Ill.1984), the Illinois Supreme Court held as follows. Nurse Levi returned to work at a nursing home after recovering from a back injury. She was repeatedly instructed not to lift patients. Two weeks after she returned to work, Levi was making rounds which involved assisting patients who wanted to go to sleep. A patient who was normally able to ambulate asked Levi for help in pivoting from her wheelchair to her bed. Levi assumed she could help the patient without actually "lifting" her. However, in the course of the maneuver the patient collapsed or commenced to fall, and in order to save the patient from dropping to the floor, Levi held on to her and lifted her into

bed. Levi reinjured her back in the process. The Illinois Supreme Court reversed a decision of the Industrial Commission to deny benefits on the basis that the determination that Levi's back injury did not arise out of and in the course of her employment was against the manifest weight of the evidence:

> Even assuming that the claimant undertook a task she was not authorized to perform when she attempted to help the patient, the fact that the employer has in general terms forbidden an employee to undertake an act is not by itself sufficient to remove the act from the scope of the employment.... In this case the evidence demonstrates that she would not have lifted the patient had an emergency not arisen when the patient started to fall. The claimant faced a choice at that point of coming to the rescue of the patient or doing nothing and thereby preventing bodily injury to herself but allowing the patient to sustain an injury, perhaps a severer one, while under the care of Fondulac. Her decision and conduct at the time of the emergency served her employer's interest as well as that of the patient by protecting Fondulac's patient and saving Fondulac from a possible suit for injuries the patient might otherwise have suffered.

> ... Because what the claimant did in this case was in the vital interest of Fondulac as her employer and was not a gross deviation from the ordinary tasks of a nursing home employee, it was consequently not beyond the scope of her employment, even if it may have exceeded the limitations placed upon her by Fondulac.

*Id.*, 77 Ill.Dec. 447, 460 N.E.2d at 753–54; and see generally *King v. Grand Cove Nursing Home*, 640 So.2d 348, 352 (La.App. 3 Cir.1994) (worker's compensation benefits affirmed where nurse violated "lifting" policy, but employer did not show that the safety device was provided solely as a guard or protection for the employee and that the employee had knowledge of its function and adequacy and deliberately failed to use it. Also, employer failed in its burden to show that claimant had a willful and wanton intent to injure herself.).

[¶ 37] Although not referenced by either party here, this subject is thoroughly annotated. Linda A. Sharp, Annotation, *Violation of Employment Rule as Barring Claim for Workers' Compensation*, 61 A.L.R.5th 375, esp. §§ 5, 10[b], and 14[b] (1998 and Supp.2005). *Smith* is included in that annotation as a case that stands generally for the proposition that an employment rule sets the boundaries of employment, and when violated, results in noncompensability because the accident did not arise out of or in the course of employment. It is given more detailed consideration in a section that concerns cases dealing with prohibitions against doing another's work, when unrelated to the employee's work (Smith was expected to have other fellow employees lift the buckets of chickens, although in rushed and hectic circumstances, which only benefited the employer, she thoughtlessly picked up a bucket of chickens.). That annotation further demonstrates that our decision in *Smith* is not in line with the modern cases on this subject. It is of some significance as well that the *Smith* case itself, as well as the other cases we cited in it in 1988 to justify its resolution, have never since been cited in support of the rule adopted therein—in this jurisdiction or in any other.

[¶ 38] In sum, I think this Court should consign the rule articulated in *Smith* to history or specifically limit its application to the rare sorts of instances condoned by reason and good conscience. If the Court is not inclined to do that, I deem it readily recognizable that it should not be applied to the circumstances of Perry's case.

[¶ 39] For these reasons, I would reverse the order of the district court affirming the hearing examiner and direct that the district court remand the case to the hearing examiner and the Division with directions that Perry's claim for benefits be paid.