2010 WY 156

**Christina CAMILLERI, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

No. S–09–0242.

Supreme Court of Wyoming.

Dec. 2, 2010.

Representing Appellant: Donna D. Domonkos, Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; and Kristen J. Hanna, Senior Assistant Attorney General.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Christina Camilleri (Camilleri), seeks review of the district court's order affirming the "Findings of Fact, Conclusions of Law and Order" issued by a

* Chief Justice at time of expedited conference.

Medical Commission Hearing Panel (Commission). The Commission determined that Camilleri was not entitled to further benefits (after June 22, 2005), that she was at an ascertainable loss as of June 22, 2005, that her attorney was relieved from any obligation to further represent her, and that the matter was remanded to the Workers' Compensation Division (Division) to carry out the mandates of the Commission's decision. We will affirm.

**ISSUES**

[¶ 2] Camilleri states this issue:

Whether there is substantial evidence to support the Commission's decision to reject [Camilleri's] evidence.

The Division rephrases what it perceives as the issues in greater detail:

I. Was the Hearing Panel's decision denying ongoing medical treatment to [Camilleri] and determination that [she] was at ascertainable loss or maximum medical improvement on June 22, 2005, supported by substantial evidence?

II. Was the Hearing Panel's decision denying ongoing medical treatment to [Camilleri] and determination that [she] was at ascertainable loss or maximum medical improvement on June 22, 2005, arbitrary capricious, or otherwise not in accordance with Wyoming law?

**Prefatory Matter**

[¶ 3] We will begin our discussion by explaining to the Division and the Medical Commission, as well as our readership in general, that petitions for review of agency decisions are governed by W.R.A.P. 12. The most important part of this review process is the record that is created at the agency level, because both the district court sitting as an intermediate court of appeals, and this Court as the court of last resort, rely almost entirely on the content of that record in resolving the issues raised by the petition for review of agency action. Rule 12.07 provides:

(a) Within 60 days after the service of the petition, or within the time allowed by the reviewing court, the agency shall

transmit to the reviewing court the original or a certified copy of the entire record of the proceedings under review and a separate letter of transmittal marked for the personal attention of the judge or judges of the reviewing court. *The record papers transmitted to the appellate court by the agency shall be securely fastened, in an orderly manner, in one or more volumes consisting of no more than 250 pages per volume, with pages numbered and with a cover page bearing the title of the case and containing the designation 'Transmitted Record,' followed by a complete index of all papers. The agency shall provide copies of the index to the reviewing court and to the parties.* Concurrently with transmitting the record, the agency shall serve notice of the transmittal on all parties.

(b) The record in a contested case shall consist of the matter required by W.S. 16–3–107(*o* ), Wyoming Administrative Procedures Act. To the extent any matter required was not preserved by the agency and there is no record, the court may take evidence on that matter. The record in all other cases shall consist of the appropriate agency documents reflecting the agency action and its basis. By stipulation of all parties to the review proceedings, the record may be shortened. Any party unreasonably refusing to stipulate to limit the record may be disciplined in accordance with Rule 1.03. The reviewing court may require or permit subsequent additions or corrections to the record. A record remanded by a court to an agency for any reason or purpose may be recalled by the remanding court, as necessary, upon its own motion. [Emphasis added.]

Also see Wyo. Stat. Ann. § 16–3–107(*o* ) through (r) (LexisNexis 2009).

[¶ 4] In this case, Volume I of the record on appeal consisted of the proceedings in the district court (intermediate court of appeals), and it was in the form required by the governing rule. The record from the agency consisted of two volumes (Volumes II and III in this Court). Volume II contained 535 pages, and they were not *securely fastened* (the initial pages and the ending pages were falling out of the volumes). Moreover, although we rely primarily upon common sense for this advice, a part of "securely fastened" includes a cover page made of something sturdier than ordinary typing paper. For so long as this Court can remember, this has entailed the use of "red backs," but any sturdy cover will do. Those preparing records should also take note that the rule requires that each volume contain *"no more"* than 250 pages. More often than not, breaking a volume at page 250 exactly may separate a document or documents in a way that does not make sense, in which case the volume break might well come before page 250 (not more than 250 pages). The record must have an index that is as complete as possible. In this case, each of the parties' disclosure statements contained numerous exhibits. Instead of the index showing where each exhibit began in the index, the index simply lumped them altogether so that Camilleri's exhibits are spread over 256 pages (they might well have been contained in a single, separate volume and as a courtesy to the courts each exhibit should have been tabbed—exceeding the not to exceed 250 pages by 6 pages would have been an acceptable adherence to the general rule). Almost always, the transcript should be a separate volume. Here, the transcript was found at pages 774–947 of Volume III (Volume III ran from page 536–947).

[¶ 5] The findings in this case demonstrate that the Medical Commission has taken to heart our requirement that findings be complete and detailed; however, references to the contents of the record on appeal were not made to pages of the record, but to documents that were not indexed, and the agency record was not paginated as it accumulated. In the future we would expect that both the clerks of the district courts and the clerk of this Court, to decline to accept the record on appeal until it is assembled in accordance with the governing rule. It is incumbent upon the agencies, in the first instance, to submit a proper record, but the parties also have a responsibility to look at the record once filed and see that it is in an acceptable form.

## FACTS AND PROCEEDINGS

[¶ 6] On September 1, 2004, Camilleri first telephonically reported an on-the-job injury to her supervisor. According to Camilleri, the injury occurred on that date at about noon, at her place of employment, the Worland Senior Center (Center). A written report, prepared on September 16, 2004, was submitted to the Workers' Safety and Compensation Division (Division) by Camilleri and her supervisor on September 16, 2004, and it was received there on September 20, 2004.

[¶ 7] Camilleri was employed at the Center as a licensed practical nurse, and her co-employee Benita Bauer (Bauer), was the cook there. In a nutshell, Camilleri claimed that Bauer ran into her, perhaps deliberately, left-shoulder to left-shoulder, in a narrow hallway at their workplace. Although Camilleri had some predisposing bodily infirmities, she asserted the shoulder blow delivered by Bauer was forceful enough to cause the immediate onset of pain to her left shoulder and her neck. Her pre-existing health problems did not include any problem with her left shoulder. The problems with Camilleri's neck had resolved by the time of hearing and were not an issue at the hearing into this matter and any injury that may have occurred to her neck is not an issue in this appeal. However, her shoulder continued to cause her great pain, and so far as the record shows, that continues.

[¶ 8] At the hearing, Camilleri's claims were that she was entitled to temporary total disability payments for the period from June 22, 2005 through July of 2006, during which time she was unable to work because of the continued problems she had with her shoulder. In early July of 2006, Camilleri found suitable employment that was within her physical capabilities at the Wyoming Boys School near Worland. She also claimed she was entitled to benefits for surgical treatment that had been recommended by her attending physician, James Randolph, M.D., an orthopedic surgeon.

[¶ 9] Throughout the early months of her treatment, Camilleri's medical care providers were unable to ascertain the cause of the pain in her shoulder and most of them perceived that Camilleri displayed a sense of pain that was not consistent with her claimed injury. Eventually she was referred to Dr. Randolph, who was still treating her as of the date of the hearing. She opted for conservative, non-invasive treatment, and Dr. Randolph respected her concerns and decisions in that regard, especially because early on Dr. Randolph warned that invasive treatment could worsen, not lessen, her pain.

[¶ 10] Camilleri received benefits from the date of injury until June 22, 2005. By letter dated June 22, 2005, the Division informed Camilleri that it would not approve payment of benefits after June 22, 2005. By letter dated June 29, 2005, Camilleri's attorney asked to be appointed to handle her client's petition for review of that decision. Apparently that appointment was made, and Camilleri has continued to be represented by counsel throughout this process. In that request, Camilleri indicated that the matter should be assigned to the Medical Commission.

[¶ 11] In a letter dated July 13, 2005, a claims analyst for the Division referred this case to the Office of Administrative Hearings (OAH) pursuant to Wyo. Stat. Ann. § 27–14–601(k)(v) (LexisNexis 2009) which provides:

**§ 27–14–601. Payment or denial of claim by division; notice; objections; review and settlement of claims; filing fee; preauthorization of hospitalization or surgery.**

(a) Upon receipt, the division shall review the initial injury reports to determine if the injury or death resulting from injury is compensable and within the jurisdiction of this act. No subsequent claim for compensation under this act shall be approved if the division determines the injury or death is not compensable and under the jurisdiction of this act or if the employer states on his injury report that the injury is not compensable, until a determination is rendered by the division. The division shall provide notice of its determination to the employee, employer and the claimant.

. . . .

(d) Upon receipt of a claim for impairment, disability or death benefits filed un-

der W.S. 27–14–403(g) or 27–14–501(e) and (f) and if the initial injury or death resulting from injury is determined compensable and within the jurisdiction of this act, the division shall determine if the injured employee or his dependents are eligible for benefits and shall approve or deny the claim in accordance with this act. If a claim is approved, the division shall determine the amount of the award for compensation in accordance with W.S. 27–14–403 through 27–14–406 and 27–14–408, if applicable. The division shall provide notice of any determination under this subsection to the employer, employee and the claimant.

(e) In accordance with this act, the division shall by rule and regulation establish necessary procedures for the review and settlement of the compensability of an injury or death resulting from injury and of claims filed under this act through interviews with employees, employers and health care personnel or through review of written reports. Nothing in this act shall prohibit the employer or division from reaching a settlement of up to two thousand five hundred dollars ($2,500.00) under this subsection in any one (1) case without an admission of compensability or that the injury was work related.

. . . .

(g) No claim for benefits under this act shall be denied based solely on the failure of the employer to have complied with the requirements of this act.

. . . .

(k) Determinations by the division pursuant to this section and W.S. 27–14–605 shall be in accordance with the following:

(i) The initial review of entitlement to benefits pursuant to subsections (a) and (e) of this section shall be made by the division within fifteen (15) days after the date the injury report or claim is filed. Following initial review, the division shall issue a final determination or if a final determination cannot be made based upon available information at that time, the division may issue a request for additional information as necessary;

(ii) Following issuance of a request for additional information under para-

graph (k)(i) of this section, the division shall investigate the matter and issue its final determination within forty-five (45) days after issuing the request;

(iii) Notice of a final determination issued by the division under this subsection shall include a statement of reasons and notice of the right to a hearing;

(iv) Any interested party may request a hearing before a hearing examiner on the final determination of the division by filing a written request for hearing with the division within fifteen (15) days after the date the notice of the final determination was mailed by the division. If the division has not rendered a final determination within sixty (60) days following the date the claim was filed, any interested party may request a hearing before a hearing examiner in the manner prescribed by this paragraph. If the written request for hearing is sent to the division by certified or registered mail, postage prepaid, return receipt requested, proof of such mailing within the time provided by this subsection with a receipt signed by an agent of the state of Wyoming shall be presumed to be timely filing of the request with the division;

*(v) Upon receipt of a request for hearing, the division shall immediately provide notice of the request to the appropriate hearing authority as determined pursuant to W.S. 27–14–616;*

(vi) If timely written request for hearing is not filed, the final determination by the division pursuant to this subsection shall not be subject to further administrative or judicial review, provided however that, in its own discretion, the division may, whenever benefits have been denied to a worker, make a redetermination within one (1) year after the date of an original determination regardless of whether or not a party has filed a timely appeal pursuant to paragraph (iv) of this subsection. [Emphasis added.]

[¶ 12]   Wyo. Stat. Ann. § 27–14–616 (LexisNexis 2009) provides:

**§ 27–14–616. Medical commission; hearing panels; creation; membership; duties; rulemaking.**

(a) The medical commission is created to consist of eleven (11) health care providers appointed by the governor as follows:

(i) Seven (7) licensed physicians appointed from a list of not less than fourteen (14) nominees submitted by the Wyoming Medical Society;

(ii) Four (4) health care providers appointed from a list of not less than eight (8) nominees developed and submitted by appropriate health care provider groups selected by the director.

(b) One (1) member shall be elected by commission members as chairman and one (1) as vice-chairman. The division shall designate an employee to serve as executive secretary of the commission or contract with an individual to provide executive secretary services to the commission. The governor may appoint no more than eleven (11) additional health care providers as associate members of the commission whose function is limited to serving as members of individual medical hearing panels. Except for initial members, the terms of commission members and associate members shall be three (3) years. Three (3) members of the initial commission and three (3) initial associate members shall be appointed to a one (1) year term and four (4) initial commission members and four (4) initial associate members shall be appointed to a two (2) year term. The duties of the commission shall be:

(i) To promulgate rules and regulations, with the approval of the director of the department, declaring particular medical, hospital or other health care procedures either acceptable or not necessary in the treatment of injuries or particular classes of injuries and therefore either compensable or not compensable under this act or expanding or limiting the compensability of such procedures under this act;

(ii) To promulgate rules and regulations, with the approval of the director of the department, establishing criteria for certification of temporary total disability by health care providers and setting forth the types of injuries for which particular health care providers may certify temporary total disability pursuant to W.S. 27–14–404(g);

(iii) To advise the division, upon request, on the usefulness of medical cost containment measures; and

(iv) To furnish three (3) members of the commission to serve as a medical hearing panel to hear cases referred for hearing. *The division shall refer medically contested cases to the commission for hearing by a medical hearing panel. The decision to refer a contested case to the office of administrative hearings or a medical hearing panel established under this section shall not be subject to further administrative review. Following referral by the division, the hearing examiner or medical hearing panel shall have jurisdiction to hear and decide all issues related to the written notice of objection filed pursuant to W.S. 27–14–601(k).* Different medical hearing panels with different membership may be selected to hear different cases, but a panel may hear more than one (1) case. Individual medical hearing panels shall be selected by the executive secretary under the supervision and guidance of the chairman of the medical commission. At least one (1) member of each panel shall be a physician. One (1) member shall be designated by the executive secretary to serve as chairman of the panel. When hearing a medically contested case, the panel shall serve as the hearing examiner and shall have exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act. For cases referred to the medical commission as small claims hearings under W.S. 27–14–602(b), the medical hearing panel may consist of one (1) physician who shall serve as the hearing examiner and shall have exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act.

(c) The members of the commission and of medical hearing panels when serving shall be immune from liability and shall be defended by the attorney general if sued and indemnified against loss from legal action in the same manner as state employees.

(d) The division shall establish a fee schedule for the compensation of members of the medical commission and medical hearing panels for their professional services to be paid from the worker's compensation account.

(e) *Upon agreement of all parties to a case, the hearing examiner in a contested case under this chapter may transfer a medically contested case to a medical hearing panel or may seek the advice of the medical commission on specified medical issues in the contested case. The advice shall be in writing and shall become part of the record of the case.* [Emphasis added.]

[¶ 13] In an order entered on September 19, 2005, the OAH assigned this matter to the Medical Commission in accordance with Wyo. Stat. Ann. § 27–14–405(m) (LexisNexis 2009) which provides:

§ 27–14–405. **Permanent partial disability; benefits; schedule; permanent disfigurement; disputed ratings.**

. . . .

(m) If the percentage of physical impairment is disputed, the division shall obtain a second opinion and if the ratings conflict, shall determine the physical impairment award upon consideration of the initial and second opinion. Any objection to a final determination pursuant to this subsection shall be referred to the medical commission for hearing by a medical hearing panel acting as hearing examiner pursuant to W.S. 27–14–616.

### DISCUSSION

**Standard of Review**

[¶ 14] The applicable standard of review is that set out in *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶¶ 22–25, 188 P.3d 554, 561 (Wyo.2008), and we set it out verbatim below:

Thus, in the interests of simplifying the process of identifying the correct standard of review and bringing our approach closer to the original use of the two standards, we hold that henceforth the substantial evidence standard will be applied any time we review an evidentiary ruling. When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. See, *Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.,* 882 P.2d 858, 860–61 (Wyo.1994); [*Board of Trustees, Laramie County Sch. Dist. No. 1 v.*] *Spiegel,* 549 P.2d [1161] at 1178 [(Wyo. 1976)] (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

The arbitrary and capricious standard remains a " 'safety net' to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Newman* [*v. State ex rel. Wyo. Workers' Safety and Compensation Div.*], [2001 WY 91] ¶ 23, 49 P.3d [163] at 172 [(Wyo.2002)]. Although we explained

the "safety net" application of the arbitrary and capricious standard in *Newman*, we will refine it slightly here to more carefully delineate that it is not meant to apply to true evidentiary questions. Instead, the arbitrary and capricious standard will apply if the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law. This listing is demonstrative and not intended as an inclusive catalog of all possible circumstances. *Id.*

There will be times when the arbitrary and capricious standard appears to overlap with some of the other standards. For example, a decision against the great weight of the evidence might properly be called arbitrary or capricious in everyday language. However, the words "arbitrary" and "capricious" must be understood in context as terms of art under the administrative review statute and should not be employed in areas where the more specifically defined standards provide sufficient relief.

In summary, while we believe *Newman* was analytically correct and supported by relevant authorities, application of the different standards of review to evidentiary matters proved confusing and led to arguably inconsistent decisions. Thus, we take this opportunity to diverge somewhat from *Newman* in order to simplify the process of determining the proper standard of review for both litigants and courts. In the future, we will apply the substantial evidence standard anytime we are reviewing an evidentiary issue.

We review an agency's conclusions of law de novo, and we will affirm such legal conclusions only if they are in accordance with law. *Dale,* ¶ 26, 188 P.3d at 561–62.

■ [¶ 15] In this case, we are called upon to apply two of the standards set out in *Dale*. First, the Commission made many credibility determinations in its analysis of the evidence and in that regard we will apply this aspect of the *Dale* standard:

If, in the course of its decision making process, the agency disregards certain evi-

dence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test.

*Dale,* ¶ 22, 188 P.3d at 561. "Substantial evidence" consists of the relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. *Id.*

[¶ 16] Second, after having examined the Commission's credibility determinations, and because the panel determined that Camilleri failed to meet her burden of proof, we must then decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party, by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole.

[¶ 17] Although mention is made of the "arbitrary and capricious" standard in the Division's brief, Camilleri did not rely on that aspect of the *Dale* standard of review, and we discern no reason to call it into play.

[¶ 18] It is not clear why this case was reassigned from the OAH to the Medical Commission. Camilleri requested that her case be assigned to the Medical Commission, but it was the Division's initial decision to assign it to OAH. The justification for the change was based upon there being a dispute about Camilleri's physical impairment rating, but the record does not bear out that any such conflict existed. So far as the record shows, none of Camilleri's treating physicians had evaluated her for an impairment rating. Nonetheless, without objection from Camilleri, the Division sent her to see Paul E. Ruttle, M.D. He performed an independent medical evaluation (Orthopedic Medical Evaluation) at the Division's request and that report was received by the Division on June 20, 2005. In the report Dr. Ruttle noted that Camilleri's impairment rating is 3%, that she had reached maximum medical improvement, and he recommended that Camilleri "undergo psychiatric evaluation on a nonindustrial injury basis." Dr. Ruttle spent 45 minutes reviewing Camilleri's voluminous medical records, 45 minutes in a face-to-face evalua-

tion of the patient, and 30 minutes in report preparation. Michael J. Ford, M.D., was also asked to do an IME on Camilleri. His report was received by the Division on September 2, 2005. He spent one hour reviewing medical records, 20 minutes with Camilleri, and 40 minutes to prepare the written evaluation. Dr. Ford concluded that her impairment rating was zero.

[¶ 19] Camilleri's primary orthopedic physician, Dr. Randolph did not provide, nor was he asked to provide, an impairment rating. As noted above, on June 22, 2005, Camilleri was informed that her further claims would be denied.

[¶ 20] All of the medical records summarized above are contained in the record on appeal. In addition, a video-conference hearing was held on May 16, 2007, at which Camilleri's primary physician testified, as did Camilleri, Camilleri's husband, and Benita Bauer, the co-worker who was alleged to have impacted her shoulder, against that of Camilleri, at their workplace, so as to injure her left shoulder.

[¶ 21] The Commission issued a lengthy decision letter on July 30, 2007. Camilleri filed a petition for review in the district court and by decision letter issued on June 24, 2009, the district court affirmed the decision of the Commission. While we always utilize and appreciate the district court's appellate decision, we afford no deference to the district court's decision. Instead, we review the agency's decision as if it came directly from the agency. *Dale*, ¶ 8, 188 P.3d at 557.

### Credibility of Witnesses

[¶ 22] Camilleri's challenge to the Commission's decision is two-pronged. It is her contention that its decision is contrary to the overwhelming weight of the evidence in the record before us. Of great importance to that argument, is her contention that the Commission credited the testimony of all witnesses for the Division, but found that Camilleri's witnesses were pretty much across the board not credible. In analyzing such credibility determinations we apply the "substantial evidence" test, i.e., is there relevant evidence in the entire record which a reasonable mind might accept in support of the credibility determinations made.

[¶ 23] We will address the Commission's credibility findings in the same order as they were memorialized in the Commission's findings. We begin by noting that the Commission considered on-going treatment of Camilleri's cervical spine as an issue in dispute at the hearing, and that it included her shoulder only parenthetically as an issue (as shown in this sentence): "Whether the . . . Claimant's ongoing treatment for her cervical spine [and shoulder] is related to her work injury." At the outset of the hearing, Camilleri conceded that the issues with her cervical spine had been resolved, and it was *only* the condition of her shoulder that was at issue at the hearing. The second issue in dispute is whether the percentage of Camilleri's physical impairment was disputed. If it was disputed, the Division was to obtain a second opinion and if that rating conflicted with the one provided by Camilleri's physician, then it was the Commission's purpose to determine the physical impairment award upon consideration of the initial and second opinion. Wyo. Stat. Ann. § 27–14–405(m) (LexisNexis 2009). In this case, Camilleri's treating physician did not provide, nor was he asked to provide, an impairment rating for his patient. Indeed, the Division obtained two "second-opinions" and wholly disregarded Dr. Randolph's testimony and all of the medical records provided by him to the Division. Both "second-opinions" conflicted with Dr. Randolph's assessment of his patient.

[¶ 24] In the Commission's findings it is noted that the Division also sought a forfeiture of benefits paid on Camilleri's behalf because she declined surgery. However, the Division did not file the necessary petition, so that claim was not considered by the Commission. See Wyo. Stat. Ann § 27–14–407 (LexisNexis 2009).

[¶ 25] The Commission noted in its findings that the report filled in (it is a fill-in-the blanks form) by Camilleri's supervisor stated only that: "Another employee walked into this employee, hitting her [left] shoulder." In a report written by Camilleri herself, she reported the incident in these words: "Bert

Bauer walked towards me and slammed her [left] shoulder and [left side] of body into my [left] shoulder and shoved me." After reviewing Camilleri's "injury report and other documents," on October 22, 2004, the Division issued a "Final Determination Opening Case" and Camilleri received benefits until late June of 2005 as noted more fully above. The Division continued to inquire about Camilleri's progress in physical therapy after June 22, 2005.

[¶ 26]  In a sworn statement given to the Worland Police Department on September 28, 2004, Camilleri elaborated on the event of September 1, 2004, and described a pattern of harassment on the part of Bauer toward her. Through her attorney, Camilleri also sought to press a claim with the Compliance Officer, Department of Employment, Labor Standards, over the incident at issue here, as well as the fact that her employment with the Center was terminated at the end of September 2004. On March 10, 2005, the new Executive Director of the Center forwarded some additional informal information from other employees of the Center, to the Division, which tended to discredit Camilleri's story that her **back** was injured on September 1, 2004. Of course, it is of some significance to note that Camilleri never made complaints about her back. It is also important to note that the record as a whole reveals that there were no "eye-witnesses" to the event Camilleri described, and the report referred to immediately above has very little evidentiary value, given that this case turned largely on depositions, sworn testimony, affidavits, and other documents that can be said to have some self-authenticating value (*e.g.*, doctor's notes, MRI's, medical tests, etc.). Camilleri said that Bauer did butt her with her shoulder, and Bauer denied it, but no one else purported to have seen the actual event in question.

[¶ 27]  The record appears to bear out that Camilleri's job at the Senior Center was eliminated because of the expiration of a grant that funded her position. However, we note at this juncture that both Camilleri and the Executive Director who was serving at the time of the incident at issue here, described the work environment of the Senior Center as dysfunctional, and this was especially true with respect to Bauer. Camilleri did not dispute the evidence brought forward by the Division that she had been treated in the past for a variety of on-the-jobs injuries/conditions, although none of these were associated with her left shoulder. Camilleri did not dispute that she suffered from anxiety/depression. It is also undisputed that Camilleri underwent a variety of medical procedures and saw several doctors in the months after September 1, 2004, and prior to the hearing on May 16, 2007. It was not until Camilleri saw Dr. Randolph that the source of her pain was diagnosed by means of an MRI, although the accuracy of that diagnosis is also a critical point in this case. A radiologist identified a labrum tear in Camilleri's shoulder and Dr. Randolph concurred with the radiologist's reading of the MRI.

[¶ 28]  The record reveals that Camilleri reported an incident wherein Bauer intentionally, or at least without pausing to acknowledge that she had done so, hit Camilleri with her left shoulder. Bauer self-reported that she is 5'9" tall and weighs 230 pounds, although she was described by both Camilleri and Wallingford as being somewhat larger than that. Camilleri was of about the same height and weighed approximately 170–80 pounds. As noted above, there were no "eye-witnesses to the event (i.e., no one reported seeing the incident that Camilleri described). Bauer reported that no such incident occurred and if there was such an encounter at all, it occurred the day before Camilleri reports it as occurring, and that she did no more than brush elbows with Camilleri at that time. Wallingford described Bauer as an "angry" and difficult employee and that she and Camilleri did not get along at all. The animosity Wallingford reported was based on the fact that Bauer did not like to have employees in her kitchen and most employees were prohibited from being there during the lunch hour, except for Camilleri and one other employee who had to go through the kitchen to get to their offices.

[¶ 29] The Commission paid especially close attention to Wallingford's testimony and set it out in detail. In one of several findings as to credibility, the Commission described Wallingford's testimony as "wanting." We construe that as a finding by the Commission that they did not believe Wallingford's testimony. The basis for that finding is that Wallingford chose to believe Camilleri (over Bauer), even though no one else witnessed the injury-causing incident, simply because Wallingford and Camilleri were friends. We note in this regard that our precedents do not require there to be "eye witnesses" to workplace injuries and that the testimony of an employee will suffice to establish that an injury occurred. This credibility determination appears to have been based on nothing more than idle speculation that Wallingford was motivated to lie because she was a "friend" of Camilleri. We can find no hint in the record that Wallingford did anything other than honestly and forthrightly describe the difficulties she had with Bauer; that Camilleri was not a difficult employee; and that Camilleri reported what Bauer had done and she believed Camilleri's report. We conclude that this credibility determination is not supported by any substantial evidence.

[¶ 30] The Commission goes on to find that Camilleri was not a credible witness either. Although the Commission's findings with respect to Camilleri's reporting of the injurious incident itself, as well as her subjective reports of the medical problems that followed, are somewhat tenuous, some of the documentary evidence does support a finding that significant portions of her testimony and reports of injury/pain were not credible. Her reports to authorities/agencies, as well as to examining physicians, were notable, in part, because they varied greatly from report to report and from time to time. Although there was a significant body of evidence to support the basic finding that Camilleri's testimony and reports lacked a sufficient level of credibility, we also note that the Commission undermined its own credibility when it decided to rely on what the Commission declared to be false reports of neck pain, when at the hearing Camilleri conceded that her neck pain problems had resolved and were no longer at issue. However, in the final balance, we conclude that the Commission's finding that much of Camilleri's testimony was not credible is supported by substantial evidence.

[¶ 31] A close examination of Dr. Randolph's testimony reveals several things of great significance in this case. First, he is the only physician who spent a meaningful amount of time with Camilleri. Second, he was the only physician who carefully examined the objective medical evidence (MRI's, etc.). Third, he is the only physician who listened diligently to Camilleri's subjective complaints. His testimony at the hearing was guarded. He acknowledged that Camilleri's condition could not be accurately diagnosed with clinical observations in the examination room, nor could it be diagnosed with certainty even with the latest and most advanced external diagnostic procedures. He conceded that he would not be able to state with certainty that she had suffered a shoulder injury until an invasive procedure was completed (one which Camilleri finally agreed to undergo quite reluctantly, because she wanted to avoid invasive procedures if possible). He also conceded that Camilleri's reports of pain appeared to be out of proportion to the injury she appeared to have suffered to her shoulder, although Dr. Randolph did diagnose a rare, but widely recognized pain syndrome that may have contributed to Camilleri's condition. However, we are unable to credit, even in the slightest degree, the Commission's findings about Dr. Randolph's credibility. The Commission concluded that Dr. Randolph had not credited the opinions of other physicians who examined Camilleri (Drs. Ruttle and Ford) and reached this conclusion: "Dr. Randolph may also have a financial stake in the outcome of this case given the extensive treatment performed after June of 2005 and for which he may not be paid." There is not so much as a scintilla of evidence to support such a finding and that this Commission would give voice to such a libelous accusation causes us great concern about the credibility of the Commission. See, *e.g., Judd v. State ex rel. Wyo. Workers' Safety & Comp. Div. (Medical Commission),* 2010 WY 85, ¶¶ 36–40, 233

P.3d 956, 970–71 (Wyo.2010); *In re Worker's Comp. Claim of Glaze v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 102, ¶¶ 27–30, 214 P.3d 228, 235 (Wyo.2009); *In re Worker's Comp. Claim v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 66, ¶¶ 16–18, 208 P.3d 41, 48 (Wyo.2009); *Decker v. State ex rel. Wyo. Med. Comm'n*, 2008 WY 100, ¶¶ 30–36, 191 P.3d 105, 121–22 (Wyo. 2008); *Nagle v. State ex rel. Wyo. Worker's Safety & Comp. Div. (In re Worker's Comp. Claim of Nagle)*, 2008 WY 99, ¶¶ 13–39, 190 P.3d 159, 166–74 (Wyo.2008); *Walton v. State ex rel. Wyo. Workers' Safety & Comp. Div. (Medical Commission)*, 2007 WY 46, ¶ 39, 153 P.3d 932, 941 (Wyo.2007); *Rodgers v. State ex rel. Wyo. Workers' Safety & Comp. Div. (Medical Commission)*, 2006 WY 65, ¶ 53, 135 P.3d 568, 585 (Wyo.2006); *Decker v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 160, 124 P.3d 686, ¶¶ 38–42, 124 P.3d 686, 698–99 (Wyo.2005); *Tarraferro v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 155, ¶¶ 18–21, 123 P.3d 912, 920 (Wyo.2005); *Vaughan v. State ex rel. Wyo. Workers' Comp. Div. (Medical Commission)*, 2002 WY 131, ¶¶ 33–36, 53 P.3d 559, 567 (Wyo.2002); *Keck v. State ex rel. Workers' Safety & Comp. Div.*, 985 P.2d 430, 433 (Wyo.1999).

**Overwhelming Weight of Evidence**

[¶ 32] Having determined that some of the Commission's credibility determinations are not supported by substantial evidence, it is now incumbent upon this Court to credit that testimony in determining the next part of the standard of review. In this regard we apply this standard: " . . . whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole." *Dale*, ¶ 22, 188 P.3d at 561.

[¶ 33] We conclude that Wallingford's testimony was credible. Her decision to file a "Wyoming Report of Injury Form" was a duty, not some sort of option that turned on whether or not she believed Camilleri, at the time Camilleri made her report. In her deposition, she testified under oath and an-

swered the questions asked of her. Her perceptions of the climate in the workplace at the Center may have differed from that of others who worked there, but the only questioning by the Division of any substance was whether or not she was still friends with Camilleri.

[¶ 34] We conclude that Dr. Randolph's testimony was credible. He appeared to be the only medical professional who had a complete grasp of Camilleri's medical picture. He was forthright in testifying that no medical expert could say that Camilleri did, or did not, have a serious injury to her shoulder, and that the final diagnosis would only come to light after surgery. He testified that the workplace incident described by Camilleri could have caused the injury, although he did not "decide" one way or the other whether it actually did happen exactly as Camilleri described. In this regard, the Commission did not appear to take into account that Dr. Randolph's duty as a physician is to treat patients who present with injuries that are treatable, whether or not he finds the details of "their history" credible or not. If Camilleri had a treatable shoulder injury, then it appeared to be his goal to do his best by her. To some extent, the other physicians who figure in the evidentiary "picture" of this case looked at her history of depression and anxiety and dismissed her as a "psychiatric" case. Camilleri never denied that she suffered from what may be categorized as "psychiatric" problems (anxiety/depression).

[¶ 35] Our criticisms of the Commission's credibility findings raise significant difficulties in crediting its ultimate conclusions. However, we have carefully reviewed all of the evidence contained in the record in reaching our ultimate holding. After that careful review, we hold that the record contains substantial evidence to support the Commission's decision to reject much of the testimony/evidence offered by Camilleri herself, as well as that the Commission's decision was not contrary to the overwhelming weight of the evidence in the record as a whole. Thus, while we are greatly concerned that the Commission's analysis of the testimonial and documentary evidence was seri-

ously flawed we conclude that the Commission's decision should be affirmed.

## CONCLUSION

[¶ 36] The decision of the district court to affirm the Medical Commission is also affirmed by this Court.

BURKE, Justice, specially concurring, with whom VOIGT, Justice, joins.

[¶ 37] I concur in the result reached by the majority but write separately for two reasons. First, I would commend, rather than criticize, the Medical Commission for its thoroughness and detailed explanations of its credibility determinations. Second, in light of those explanations, it is not the function of this Court to reweigh the Commission's credibility determinations.

[¶ 38] It is difficult to imagine a more comprehensive written decision than the Medical Commission's "Findings of Fact, Conclusions of Law and Order of Medical Commission Hearing Panel" issued in this case. The document is 40 pages in length. As demonstrated by the excerpts set forth below, the evidence before the Commission is presented in exhaustive detail. Most significantly, the Commission fully explained how it weighed that evidence. Where conflict in the testimony exists, the Commission explained how it resolved that conflict. Where evidence is disregarded based upon credibility concerns, the Commission provided a full explanation. "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test." *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). *See also Chavez v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2009 WY 46, ¶ 18, 204 P.3d 967, 971 (Wyo.2009). Based upon my review of the record, I would conclude that the Commission's credibility determinations were supported by substantial evidence.

[¶ 39] We have previously emphasized that a Medical Commission, in rendering its decision, should make specific credibility determinations. *Walton v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2007 WY 46, ¶ 31, 153 P.3d 932, 939 (Wyo.2007). On occasion, we have found it necessary to remand a case because the hearing examiner failed to provide specific findings of credibility, making appellate review of the decision impossible. *E.g., Olivas v. State ex rel. Wyo. Workers' Comp. Div.,* 2006 WY 29, ¶ 17, 130 P.3d 476, 486 (Wyo.2006) ("When the resolution of a claim for benefits rests largely, if not exclusively, on an assessment of a claimant's credibility, a hearing examiner's failure to make findings regarding the claimant's credibility on the record renders an effective review of the order denying benefits impossible."). This is not such a case, and the majority does not suggest otherwise. Instead, the majority engages in its own credibility determinations. That is not the proper function of this Court and is directly at odds with our precedent. "Credibility determinations are the unique province of the hearing examiner, and we eschew re-weighing those conclusions." *Hamilton v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2001 WY 20, ¶ 11, 18 P.3d 637, 640 (Wyo.2001). *See Huntington v. State ex rel. Wyo. Workers' Comp. Div.,* 2007 WY 124, ¶ 11, 163 P.3d 839, 842 (Wyo.2007); *Olivas,* ¶ 17, 130 P.3d at 485–86. This Court is not in a position to make determinations regarding the credibility of witnesses. The determination of the weight and credibility of the evidence is assigned by law to the administrative agency as the trier of fact, and it is not within this Court's prerogative to perform that duty. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 980 P.2d 332, 335 (Wyo.1999).

[¶ 40] At its core, this case revolved around the credibility of Ms. Camilleri. The Commission found that she was not credible, and there is ample support in the record for that determination. There is also support in the record for the Commission's conclusion that the testimony of her supervisor, Kathy Wallingford, was "wanting," and that the evidence presented by other medical experts was more persuasive than the testimony of Dr. Randolph, Ms. Camilleri's treating physician.

[¶ 41] The majority concludes that the Commission did not believe Ms. Wallingford's testimony "simply because Wallingford and Camilleri were friends." That is not accurate. Their friendship was a factor mentioned by the Commission in discussing Ms. Wallingford's testimony, but there were additional reasons. Ms. Wallingford did not witness the accident. Additionally, she investigated the incident and could not find one witness to corroborate Ms. Camilleri's story. After describing Ms. Wallingford's testimony in detail, the Commission summed up its view of the testimony this way:

46. ... The Panel notes that Ms. Wallingford is a friend of Ms. Camilleri's. Despite the fact that she was not present on the day of the incident, and that she was unable to confirm that anything occurred on the day in question by interviewing kitchen staff, it appears that she is accepting 100% of the Employee/Claimant's version of the events. Ms. Wallingford was terminated by the employer shortly after this incident by the board of directors. On the whole, the Panel finds that the credibility of Ms. Wallingford is wanting.

[¶ 42] That finding dovetails with the Commission's credibility determination regarding Ms. Bauer, the employee who allegedly caused the injury. According to the Commission:

49. Overall, the testimony of Ms. Bauer was credible and it appears this was a very minor incident. It is undisputed that numerous employees and volunteers [were] working in and near the kitchen when this event occurred. This is a small area. Had a significant event occurred in the doorway, it is probable that there would have been someone who saw something. No witness was called to corroborate the Employee/Claimant's version of these events. From her appearance before the Medical Commission, Ms. Bauer is in her late 50's or early 60's. She is five feet nine inches tall and [at] the time of the accident weighed 230 pounds. Ms. Camilleri is of similar height and weighed 170 pounds at the time of this incident. It seems highly improbable that Ms. Bauer administered a "body check" to Ms. Camilleri that would

rival that of a hockey player. Ms. Wallingford conducted an investigation of this incident and none of the kitchen workers saw anything or were aware of any incident.... The Panel believes that this event was a very minor occurrence and that it is highly improbable that Ms. Camilleri sustained any injury.

[¶ 43] The Commission's "body check" reference is, in large measure, a response to the escalating versions of the incident given by Ms. Camilleri to her physicians and others. According to the Commission:

48. The record and testimony show[ ] that Ms. Camilleri was not credible in her reports to her doctors or to the Panel in this case. Her tone and demeanor during testimony and cross examination indicated she was not being forthcoming. The story of this event as related by Ms. Camilleri has grown and been dramatically changed over time. The report of injury filed with the Division noted that "another employee walked into this employee, hitting [left] shoulder." The report filed with her employer stated that Ms. Bauer slammed her left shoulder and upper body into Ms. Camilleri and shoved her. The Division's injury report paints a picture of a minor incident. The report to her employer presents an entirely different picture. Ms. Camilleri then reports to the police department that she had been assaulted numerous times by Ms. Bauer. However, no corroborating evidence of such was presented. In fact, Ms. Camilleri testified in her deposition that there were no prior physical contacts with Ms. Bauer. This report to the police corresponds to the time Ms. Camilleri lost her job. However, when Ms. Camilleri saw Dr. Jessen on October 28, 2004, she did not say anything about the work incident in issue. By the time she saw Dr. Biles she reported being deliberately slammed into or run into by a co-worker. She then told Dr. Goodman she had been hit by a door opened by a co-employee and she felt a "pop in her neck" and pain into her left shoulder. By the time she saw Dr. Randolph, Ms. Camilleri related that when she was struck by a co-worker she was knocked to the ground. She told Dr. Ruttle that when she was hit

she felt a "pop" in her neck and that she had to catch herself on a counter. This was the first time since the injury that Ms. Camilleri related using her left arm to brace or catch herself. Ms. Camilleri then told Dr. Bilbool, a Psychiatrist, that she was tackled by a co-worker who hit her in the chest and shoulder.

(Internal citations omitted.)

[¶ 44] Those conflicting "histories" served as a partial basis for the Commission's decision to provide less weight to the opinion of Dr. Randolph. But the Commission also provided additional explanation:

54. The evidence is clear that Ms. Camilleri had a long history of neck and upper extremity issues. She treated with her chiropractor the day before the incident in question and received treatment on her neck. The incident involving Ms. Bauer was a minor or insignificant event. The Panel does not believe Ms. Camilleri sustained a neck injury. The Panel agrees with Dr. Goodman that, at worst, she sustained a minor exacerbation of her ongoing neck problems and this would have resolved within a short period of time. This is confirmed by Drs. Ruttle and Ford as well. Her neck was certainly at maximum medical improvement by June 22, 2005. To the extent Ms. Camilleri's doctors have opined to the contrary, they were related a history [by] the Employee/Claimant that some significant event occurred. These doctors were not fully aware of the Employee/Claimant's significant pre-existing history. They relied heavily on the subjective complaints of Ms. Camilleri. Dr. Randolph bases much of his opinions on Ms. Camilleri's history that at the time of the injury she spun and had to catch herself on her outstretched left arm. As discussed below, the Panel finds this did not occur. They also do not appear to be fully cognizant of Ms. Camilleri's hostility toward her former employer and co-employee, or the psychological factors in this case. None of these doctors, including Dr. Randolph, have adequately explained the cause of her pain. Likewise, these doctors do not appear to be fully aware of the variable and contradictory findings by other doctors as discussed throughout these findings. No one has explained the claims of bilateral upper extremity problems. There are reports of global pain, exaggerated pain, and pain behaviors that are not addressed. There is little objective evidence of a work injury. Dr. Randolph doggedly maintains that Ms. Camilleri has C.R.P.S. despite [the] fact that no criteria for this diagnosis exist as will be discussed below. Dr. Randolph may also have a financial say in the outcome of this case given the extensive amount of treatment performed after June of 2005 and for which he may not be paid.

55. As to the shoulder, again this was a minor incident. Prior to July of 2005, no doctor was able to determine what, if anything, was the cause of her claimed shoulder pain. No doctors were able to find laxity in the shoulder or confirm ... popping or snapping in the shoulder. In July of 2005 Ms. Camilleri reported an incident where her shoulder may have shifted in bed. After this point her pain level appears to have increased. Thereafter, a physical therapist noted in September 2005, that Ms. Camilleri may have some instability in her shoulder and the shoulder did show some sliding to the front of the glenoid. She also had positive impingement testing. Left shoulder instability was also noted at the pain clinic in Billings. Following this July 2005 incident, a left shoulder arthrogram MRI was done that indicated a small tear of the glenoid labrum. Dr. Randolph testified that the MRI is not 100% diagnostic and the only way to confirm a glenoid labrum tear is through surgery. Dr. Ford did not believe the MRI showed a tear. Importantly, both Dr. Randolph and Dr. Ford both testified that such conditions are not caused by a direct blow to the shoulder. Such conditions occur from falling or landing on an outstretched arm or repetitive throwing. It was not until Ms. Camilleri saw Dr. Ruttle in July of 2005, that she ever reported using her left arm to catch herself on a counter. The accident and injury reports, as well as history to her many doctors, including Dr. Randolph, never said that the impact caused her to spin around requiring her to catch herself with

her left arm. This change in her story did not occur for many months. Thus, the required mechanism for such an injury did not occur or exist—i.e., falling or landing on an outstretched arm. Based on the testimony from Ms. Bauer, it is questionable if there was even a counter top in proximity to where this claimed event occurred. The glenoid labrum tear, if it exists, is not related to the work injury in question.

Like her neck, the Panel finds that at worst, she would have sustained a minor bump on her left arm and shoulder which would have resolved in a short period of time and certainly by June of 2005.

56. The Panel does not believe Ms. Camilleri has C.R.P.S. Drs. Ruttle and Ford opined that she does not have this condition. By a lack of notation, it appears that Dr. Gee does not believe she has this condition nor did the pain clinic in Billings. Dr. Randolph wrote and testified that her only symptom of this condition was exaggerated pain. Ms. Camilleri's skin was warm and dry. She does not have discoloration, swelling, abnormal sweating patterns, or vascular changes. Dr. Randolph has never seen a case of C.R.P.S. develop from an impact to the shoulder such as alleged in this case.

The AMA Guides to the Evaluation of Permanent Impairment (5th Edition) at Table 16–16 at pg. 496 provides *objective diagnostic criteria* for C.R.P.S. An individual who meets eight or more of the criteria has probable C.R.P.S. If an individual has less than eight of the findings it is unlikely they are suffering from this condition. This table provides the following:

*Local clinical signs:*

Vasomotor changes:

- Skin color: mottled or cyanotic
- Skin temperature: cool
- Edema

Pseudomotor changes:

- Skin dry or overly moist

Trophic changes:

- Skin texture: smooth, nonelastic
- Soft tissue atrophy: especially in fingertips

- Joint stiffness and decreased passive motion
- Nail changes: blemished, curved, talon-like
- Hair growth changes: fall out, longer, finer

*Radiographic signs:*

- Radiographs: trophic bone changes osteoporosis
- Bone scan: findings consistent with C.R.P.S.

The only evidence that Ms. Camilleri has this condition is reported pain, which is subjective. None of the other diagnostic criteria are present. If Ms. Camilleri has some type of chronic pain, it is not from the work events in issue.

(Internal citations omitted; emphasis in original.)

[¶ 45] It should also be noted that this was a medically contested case heard by a panel of the Medical Commission. The panel members in this case included three physicians, two of whom were board certified. "The role of the Medical Commission is to resolve medically contested issues through the professional expertise of [healthcare] providers. The Commission's role includes determining the weight to be given to medical opinion testimony, and will not be reweighed upon review." *Hurley v. PDQ Transport, Inc.,* 6 P.3d 134, 138 (Wyo.2000) (citation omitted). The Medical Commission is not obligated to accept the findings of a medical expert if, in their expertise, the Commission determines that the factual basis for the medical opinion is not credible or reliable. *Id.* The findings of the Commission in this case demonstrate that it did not ignore Dr. Randolph's testimony. It fully considered his testimony, but found his opinion was not credible. The Commission's findings were not clearly erroneous and were supported by substantial evidence.

[¶ 46] As a final note, I also take exception to the majority's harsh criticism of the Commission for mentioning Dr. Randolph's potential financial interest in the outcome as a credibility factor. Arguably, this finding is not supported by substantial evidence because Dr. Randolph was never specifically

asked if his medical bills had been paid and the Claimant testified that she was seeking "reimbursement" for medical bills that she, or her insurance company, had paid. It should be noted, however, that the financial interest of a witness in the outcome of a case is relevant to determining the bias of the witness.

> Nor is it to be disputed that the court in its discretion may allow counsel to cross-examine an expert witness as to the amount he has received, is to receive, or expects to receive for treatment, examination or testifying, for such information has a possible bearing upon the witness's impartiality, credibility and interest in the result. *Grutski v. Kline*, 352 Pa. 401, 43 A.2d 142 [1945]; *Commonwealth v. Simmons*, 361 Pa. 391, 65 A.2d 353 [1949]; *Duffy v. Griffith*, 134 Pa.Super. 447, 4 A.2d 170 [1939]; 70 C.J. 1158, pages 954, 955.

*McNenar v. New York, C. & S.L.R. Co.*, 20 F.R.D. 598, 600 (D.Pa.1957). In any event, it is obvious that the Commission did not rely on this credibility factor to justify a total disregard of Dr. Randolph's testimony. *See, e.g., Glaze v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 102, ¶ 29, 214 P.3d 228, 235 (Wyo.2009).